**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF TENNESSEE**

In re

                                              Case No.  05-38222

DAVID LEE HARTLEBEN
ASHLEY HARTLEBEN

          Debtors

      DAVID LEE HARTLEBEN
      ASHLEY HARTLEBEN

          Plaintiffs

          v.                                    Adv. Proc. No. 05-3392

      CARSMART EZ LOAN, LLC

          Defendant

**M E M O R A N D U M**

**APPEARANCES:**    LAW OFFICES OF MAYER & NEWTON
      Richard M. Mayer, Esq.
      1111 Northshore Drive
      Suite S-570
      Knoxville, Tennessee  37919
      Attorneys for Plaintiffs

      WOOLSEY & WOOLSEY
      Roger A. Woolsey, Esq.
      118 South Main Street
      Greeneville, Tennessee  37743
      Attorney for Defendant

**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding is before the court upon the Complaint filed by the

Plaintiffs/Debtors on December 28, 2005, seeking a determination that the Defendant, Carsmart EZ

Loan, LLC, willfully violated the automatic stay of 11 U.S.C. § 362(a) (2005) and that they are

entitled to a judgment for actual damages, including attorneys' fees, and punitive damages as

allowed under 11 U.S.C. § 362(k)(1) (2005).[1]  In the event the court finds that any stay violation by

the Defendant cannot be deemed willful under § 362(k)(1), the Plaintiffs nonetheless seek a

judgment for their actual damages and attorneys' fees pursuant to the authority granted the court

under 11 U.S.C. § 105(a) (2005).[2]

The trial was held on June 28, 2006.  The record before the court consists of the testimony

of five witnesses, Nicole Horner, John Hood, Brent Hunter, and the Plaintiffs, together with five

exhibits introduced into evidence.  Additionally, pursuant to Rule 201 of the Federal Rules of

Evidence, the court takes judicial notice of relevant documents filed in the Plaintiffs' bankruptcy

case file.

This is a core proceeding.  28 U.S.C.A. § 157(b)(A) and (O) (West 1993).

---

[1] In the Pre-Trial Order prepared by the parties that was entered by the court on March 15, 2006, and in their respective pretrial briefs, the parties referenced 11 U.S.C. § 362(h) (2004).  Because the Debtors commenced their bankruptcy case after the October 17, 2005 effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, the correct citation is to 11 U.S.C. § 362(k)(1) (2005).  As applicable to this adversary proceeding, the language and application of former § 362(h) and the current § 362(k)(1) are identical.

[2] Although the March 15, 2006 Pre-Trial Order limits the issues to be resolved  by the court to be "[w]hether the Defendant violated the Automatic Stay as set forth in 11 U.S.C. Section 362(a), and whether such violation was willful such to award damages as set forth in 11 U.S.C. Section 362(h)[sic]," the Plaintiffs, in their brief filed on May 23, 2006, and at trial, argued their entitlement to damages under 11 U.S.C. § 105(a) in the event the court found the Defendant's violation of the stay to have been non-willful.  Because the Defendant was not surprised by the § 105(a) issue and raised no objection at trial, the court deems the pleadings and Pre-Trial Order amended to conform to the evidence. *See* Rule 15(b) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7015 of the Federal Rules of Bankruptcy Procedure.  *See*, *e.g.*, *Parker v. Boston Univ. (In re Parker)*, 334 B.R. 529, 537 (Bankr. D. Mass. 2005).

**I**

The Plaintiffs filed the Voluntary Petition commencing their bankruptcy case under Chapter 13 of the Bankruptcy Code on November 9, 2005, at 11:42 a.m.  Included within their statements and schedules is a debt to the Defendant listed in the amount of $8,500.00 for the purchase of a 1996 Chevrolet Blazer (Blazer).  The Debtors' Chapter 13 Plan, which was confirmed on January 18, 2006, treats the Defendant's claim as secured, assigning a value to the Blazer of $8,500.00, to be paid in monthly installments of $165.00 plus 6.0% interest.

In the early evening of November 8, 2005, the Defendant, through its agent, AAA Recovery and Transport (AAA), attempted to repossess the Blazer from the Plaintiffs' residence.  Mrs. Hartleben was present, and she advised the repossession agent that she was filing for bankruptcy. A deputy from the Hamblen County Sheriff's Department was also present at the Plaintiffs' home, and the repossession agent left without taking the Blazer.

In the afternoon hours of November 9, 2005, the Defendant, again through its agent, AAA, returned to the Plaintiffs' home and, without the knowledge of the Plaintiffs, successfully repossessed the Blazer.  Upon receiving confirmation that the Plaintiffs had, in fact, filed a Chapter 13 bankruptcy case prior to the repossession, the Defendant directed AAA to return the Blazer, and it was delivered back to the Plaintiffs within a few hours.  Later that evening, Mrs. Hartleben filed a police report with the Hamblen County Sheriff's Department advising that during the repossession, the lock and chain on her gate were cut, and three prescription medications were missing from the Blazer when it was returned.  *See* TRIAL EX. 1.  In addition to the items included on the police report,

the Plaintiffs aver that the transfer case on the Blazer was damaged during the repossession, as was

an overhead console inside the Blazer.

## II

The commencement of the Plaintiffs' bankruptcy case triggered the protection of the

automatic stay of § 362(a), which provides, in material part:

> (a) Except as provided in subsection (b) of this section, a petition filed under section 301 . . . operates as a stay, applicable to all entities, of—
>
> . . . .
>
> > (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate; [or]
> >
> > . . . .
> >
> > (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title[.]

11 U.S.C. § 362(a).  The automatic stay remains in effect throughout the pendency of the bankruptcy

case, providing debtors with "'a breathing spell' from collection efforts and . . . shield[s] individual

creditors from the effects of a 'race to the courthouse,' thereby promoting the equal treatment of

creditors." *In re Printup*, 264 B.R. 169, 173 (Bankr. E.D. Tenn. 2001).  Actions taken in violation

of the automatic stay are "invalid and voidable and shall be voided absent limited equitable

circumstances." *Easley v. Pettibone Mich. Corp.*, 990 F.2d 905, 911 (6th Cir. 1993).

The undisputed testimony from all witnesses was that the repossession occurred after the

Debtors commenced their Chapter 13 case on November 9, 2005.  Therefore, the Defendant violated

the automatic stay when it repossessed the Blazer, through its agent, AAA.  *See, e.g., Nissan Motor Acceptance Corp. v. Baker (In re Baker)*, 239 B.R. 484, 488 (N.D. Tex. 1999) ("A post[-]petition repossession is unquestionably a violation of the automatic stay.").  A creditor that has repossessed property of the debtor must turnover the property upon the filing of a bankruptcy petition, and the failure to do so "constitutes 'the exercise [of] control over property of the estate' for purposes of the automatic stay in 11 U.S.C. § 362(a)(3)[,]" such that a creditor's post-petition retention of repossessed property of the debtor may constitute a willful violation of the stay.  *TranSouth Fin. Corp. v. Sharon (In re Sharon)*, 234 B.R. 676, 682, 688 (B.A.P. 6th Cir. 1999).

It is the court's responsibility to determine whether a violation was willful, thus requiring imposition of the statutory sanctions set forth in § 362(k)(1).[3]  "A violation is willful if 'the creditor deliberately carried out the prohibited act with knowledge of the debtor's bankruptcy case.'" *Printup*, 264 B.R. at 173 (quoting *Walker v. Midland Mortgage Co. (In re Medlin)*, 201 B.R. 188, 194 (Bankr. E.D. Tenn. 1996)).

> A specific intent to violate the stay is not required, or even an awareness by the creditor that her conduct violates the stay. It is sufficient that the creditor knows of the bankruptcy and engages in deliberate conduct that, it so happens, is a violation of the stay. Moreover, where there is actual notice of the bankruptcy it must be presumed that the violation was deliberate or intentional.
>
> Satisfying these requirements itself creates strict liability. There is nothing more to prove except damages.

---

[3]       [A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(k)(1) (2005).

*Printup*, 264 B.R. at 173 (quoting *In re Daniels*, 206 B.R. 444, 445 (Bankr. E.D. Mich. 1997)); *see*

*also In re Dunning*, 269 B.R. 357, 362 (Bankr. N.D. Ohio 2001) (a willful violation of the automatic

stay does not require a specific intent to violate the stay). If the court has determined that a willful

violation occurred, § 362(k)(1) mandates an award of actual damages, including costs and attorney's

fees, and "in appropriate cases, [an injured debtor] may recover punitive damages." 11 U.S.C.

§ 362(k)(1).

Here, the record does not support a finding that the Defendant willfully violated the

automatic stay. The record does, however, support a finding that even though the Defendant acted

promptly to remedy the automatic stay violation, a violation nevertheless occurred, and the Plaintiffs

are entitled to recover the damages that they sustained as a result of the stay violation, including their

attorneys' fees.

There was conflicting testimony at trial. It is, however, undisputed that an employee of

AAA, hired by the Defendant, came to the Plaintiffs' home on the evening of November 8, 2005,

for the purpose of repossessing the Blazer, that the vehicle was not repossessed on November 8,

2005, but that it was repossessed in the mid-afternoon hours of November 9, 2005, after the

Plaintiffs filed their Chapter 13 bankruptcy case at 11:42 a.m..

Mrs. Hartleben testified that the attempted repossession occurred at approximately 6:00 p.m.

on November 8, 2005, and that she advised the repossession agent that the Plaintiffs had filed for

bankruptcy and gave him her attorney's card so that he could verify whatever information he

needed.[4]  She also testified that the AAA agent called the sheriff's deputy, who advised that the

Blazer could not be repossessed without breaching the peace.  The AAA agent left the Plaintiffs'

home without repossessing the Blazer.

The following day, sometime in the mid-afternoon hours of November 9, 2005, the Blazer

was repossessed by the Defendant, through its agent, AAA.  Mrs. Hartleben testified that she went

to the grocery store around 2:00 p.m. on November 9, 2006, at which time she purchased groceries

and three separate prescription medications.  Upon returning home, she testified that she got her

children out of the vehicle and took them inside, leaving her purse, the groceries, approximately

$1.00 in change, and the medication in the Blazer.

Upon returning outside to unload her car, at approximately 3:00 p.m., Mrs. Hartleben

discovered that the Blazer was gone, her gate was open, the lock and chain were missing, and her

driveway had ruts in it.  Within three or four hours, after telephone calls between the Plaintiffs, their

attorney, the Defendant, and AAA, the Blazer was returned to the end of the Plaintiffs' driveway.

Mrs. Hartleben testified that she then ascertained that her medication was missing from the vehicle.

She called the Hamblen County Sheriff's Department and filed a police report complaining that the

lock and chain on her gate were cut and that her medication was missing.  Mrs. Hartleben testified

that she also complained to the deputy about damage to her driveway, but he did not consider it

relevant to record on the police report concerning her missing items.  She testified that it was not

until the next day, after the Blazer had been sitting in the carport, that the Plaintiffs became aware

---

[4] During cross-examination, Mrs. Hartleben clarified that she thought their case was filed on November 8, 2005,
when she received their paperwork.  The court finds this explanation to be credible.

that the transfer case was cracked open, that oil or transmission fluid was leaking from the vehicle, and that an interior storage console was broken.

John Hood testified that he was the AAA agent present at the Plaintiffs' home on both November 8, 2005, and November 9, 2005, and that he did, in fact, repossess the Blazer on November 9, 2005. With respect to the attempted repossession on November 8, 2005, Mr. Hood testified that he called the sheriff's deputy upon arriving at the Plaintiffs' residence because the gate was locked, and dogs were present. He testified that Mrs. Hartleben came outside and told him that they were filing for bankruptcy. Mr. Hood testified that he told Mrs. Hartleben that he needed a card with her attorney's name and phone number or a docket number, but that she did not give him any information. This testimony is in direct conflict with the testimony of Mrs. Hartleben that she gave Mr. Hood her bankruptcy attorney's card on November 8, 2005. Mr. Hood testified that he could not, at that time, repossess the vehicle without breaching the peace, so he left.

With respect to the repossession on November 9, 2005, Mr. Hood testified that when he returned to the Plaintiffs' residence, the gate was not locked but was fastened with a "carabiner" clip, which he removed in order to open the gate. He testified that he "unhooked the carabiner and [] tossed the chain into the bushes to prevent [him] from being locked on their property if they were to catch [him]." Mr. Hood testified that because he had a key to the Blazer, given to him by the Defendant, he attempted to drive the Blazer but, as the key only worked on the door locks, he was required to leave the Plaintiffs' residence in order to get a tow truck. He testified that he then disabled the Blazer by disconnecting the linkage so that the Plaintiffs could not remove the vehicle

before he returned.  Mr. Hood testified that he returned approximately fifteen minutes later, hooked the Blazer to the tow truck, and left.

Mr. Hood testified that he called the police to report the repossession and began his trip to Greeneville to deliver the Blazer to the Defendant.  On the way to Greeneville, Mr. Hood testified that he received a telephone call from his employer telling him to return the Blazer.  He stated that he left the Blazer at the end of the Plaintiffs' driveway, approximately fifty feet from the Plaintiffs' gate, but that he did not reenter the Plaintiffs' property.  Mr. Hood also testified that he had a friend with him, who was not an employee of AAA, but the friend did not enter the Blazer.  Mr. Hood testified that he did an inventory of the Blazer, and property inside included between $20.00 and $30.00 in cash, portable dvd players, groceries, and golf clubs.[5]  He testified that he did not remember seeing any prescription medication in the vehicle; that he did not remove anything from the vehicle; that he did not damage the transfer case; and that he noticed oil or fluid leaking from the Blazer when he disconnected the linkage prior to repossessing it.  Mr. Hood denies that he damaged the driveway or that he cut the chain on the fence.

Brent Hunter, who handles collections and repossessions for the Defendant, testified that he actually spoke to Mrs. Hartleben on November 9, 2005, regarding payment arrangements, and at that time, she advised him that the Plaintiffs had filed bankruptcy under Chapter 13.[6]  He testified that he then advised Kevin Gray with AAA not to pick up the vehicle since the Plaintiffs had filed for

---

[5] Mrs. Hartleben testified that there was possibly $1.00 in change in the vehicle and that there were no golf clubs in the Blazer.

[6] Mrs. Hartleben denies speaking with Mr. Hunter on November 9, 2005, testifying instead that it was her husband alone who spoke with Mr. Hunter that day.

bankruptcy.  Mr. Hunter testified that approximately thirty to forty-five minutes after he talked to

Kevin Gray, he received a telephone call from the Plaintiffs' attorney's office, advising that the

repossession had, in fact, occurred.  Mr. Hunter testified that he immediately contacted AAA a

second time, directing the return of the Blazer to the Plaintiffs as soon as possible.

Mr. Hunter testified that he received a telephone call from Mr. Hartleben sometime between

5:00 p.m. and 7:00 p.m. on November 9, 2005, advising that the following damages had occurred

during the repossession:  (1) the back window of the Blazer was damaged; (2) the prescription

medications were missing; (3) the chain from the gate was missing; (4) the driveway was damaged;

and (5) something had occurred with the Plaintiffs' dogs getting out of the fence.  Mr. Hunter

testified that Mr. Hartleben did not mention anything about damage to the transfer case or the interior

console during that telephone conversation.

Mr. Hartleben testified that he telephoned Mr. Hunter on November 9, 2005, after the Blazer

had been returned to his home.  At the time of the repossession, Mr. Hartleben, who is an over-the-

road truck driver, was on the road, but he learned of the repossession from Mrs. Hartleben who told

him about the damage to the driveway, the gate, and the missing medication.  Mr. Hartleben

acknowledged that he advised Mr. Hunter of these damages but denies that he complained about the

back windshield or anything to do with the Plaintiffs' dogs getting out.  Mr. Hartleben testified that

after he returned home on November 10, 2005, he observed fluid leaking out of the Blazer onto the

carport floor and that the Blazer had never leaked before, nor had it had any problems prior to the

repossession.  Mr. Hartleben also testified that he saw the ruts in the driveway, which he estimated

10

to be between three and five inches deep, leading him to conclude that the Blazer was dragged along

the driveway during the repossession.

### III

Because the Blazer was repossessed after the Plaintiffs filed for bankruptcy, the Defendant

violated the automatic stay.  However, immediately after learning that the Plaintiffs had filed, the

Defendant took action to have the Blazer returned, and, in fact, the Plaintiffs were again in

possession of the vehicle within approximately three hours.  Nevertheless, the record supports the

Plaintiffs' contention that the Blazer was damaged by the Defendant's agent, AAA, during the course

of the repossession, and the Defendant must compensate the Plaintiffs for those damages, including

the attorneys' fees that they incurred to prosecute this action.

Section 105(a) imposes upon the court a duty to uphold the provisions of the Bankruptcy

Code and defines the power of the court as follows:

> The court may issue any order, process, or judgment that is necessary or appropriate
> to carry out the provisions of this title.  No provision of this title providing for the
> raising of an issue by a party in interest shall be construed to preclude the court from,
> sua sponte, taking any action or making any determination necessary or appropriate
> to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C.A. § 105(a).  "'The basic purpose of section 105 is to [provide] the bankruptcy courts [the]

power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction.'"

*Casse v. Key Bank Nat'l Ass'n (In re Casse)*, 198 F.3d 327, 336 (2d Cir. 1999) (quoting 2 COLLIER

ON BANKRUPTCY ¶ 105-5 to -7 (Lawrence P. King ed., 15th ed. 1999)).  Nevertheless, "§ 105(a) is

not without limits, may not be used to circumvent the Bankruptcy Code, and does not create a private

cause of action unless it is invoked in connection with another section of the Bankruptcy Code." *In re Rose*, 314 B.R. 663, 681 n.11 (Bankr. E.D. Tenn. 2004) (citations omitted). Instead, the court may only use its § 105(a) equitable powers "in furtherance of the goals of the [Bankruptcy] Code." *Childress v. Middleton Arms, L.P. (In re Middleton Arms, L.P.)*, 934 F.2d 723, 725 (6th Cir. 1991).

The Plaintiffs are entitled to recover actual damages incurred during the course of the repossession that occurred in violation of the automatic stay. They aver that the following damages stem from the repossession: (1) the transfer case on the Blazer was cracked, and it now leaks oil or transmission fluid; (2) a storage console in the Blazer was broken; (3) three prescription medications that had been in the Blazer were missing; (4) the lock and chain on their gate were cut and removed; and (5) their driveway was damaged when the vehicle was dragged, leaving ruts and holes. Mrs. Hartleben testified that it would cost $575.00 to fix the broken transfer case, that she paid $25.00 to fix the console, that she had paid $178.00 for the medication, and that it would cost $740.22 to obtain the gravel necessary for the Plaintiffs to repair their driveway. There was no evidence presented as to the value of the lock and chain.

Of these damages, only the driveway damage and the transfer case were challenged by the Defendant. With respect to the driveway, the Defendant argued that the driveway was not actually damaged during the repossession. In support of their claim, the Plaintiffs submitted photographs showing ruts in the gravel on their driveway. Additionally, both of the Plaintiffs and Nicole Horner, a friend who has been on the Plaintiffs' property numerous times, testified that there were no ruts in the driveway prior to the repossession. In opposition, the Defendant argued that Mr. Hood did not drag the Blazer during the repossession; however, it offered no evidence to refute the testimony that

the driveway did not have ruts until after the repossession.  Based upon the evidence presented, the

court finds that the Plaintiffs' driveway was, in fact, damaged during the repossession on

November 9, 2005, and the Plaintiffs are entitled to damages therefor.

Mrs. Hartleben testified that she obtained an estimate from Concrete Materials, Inc., in

Morristown, Tennessee, for the costs to repair the damage to their driveway, which was submitted

as Trial Exhibit 5.  According to Mrs. Hartleben's testimony and this estimate, one truck of gravel

costs $370.11, and to repair only the ruts, the Plaintiffs would require two truck loads, with a total

price of $740.22.  The Defendant questioned why the estimate states that it would cost $7,402.20 and

require twenty trucks of gravel.  Mrs. Hartleben explained that was the estimate if they decided to

redo their entire driveway and allowed Concrete Materials, Inc., to deliver and spread it.  She

testified that the $740.22 figure included just enough gravel to fill the ruts and that the Plaintiffs

would have to spread it themselves.[7]

With respect to the transfer case, the Plaintiffs both testified that the Blazer was in good

working condition and that it was only after the repossession that the vehicle leaked fluid.  Mrs.

Hartleben testified that she obtained more than one estimate for fixing the transfer case, and the

lowest she received was $575.00.  When questioned as to why this did not appear on the police

report marked as Trial Exhibit 1, she stated that she was unaware that the vehicle was damaged and

leaking fluid until the next day.  Similarly, Mr. Hartleben testified that he observed a puddle of

---

[7] Mrs. Hartleben also testified that their home was worth $59,000.00 before the repossession, but due to the
damage done to the driveway, it was now only worth $52,000.00.  She testified that these figures were based upon the
Plaintiffs' recent attempts to refinance their insurance and information they received during that process.  The court finds,
however, that the Plaintiffs offered nothing to substantiate these values, and that Mrs. Hartleben's testimony on valuation
is speculative at best.  Accordingly, the alleged diminution in the value of the residence will not be considered by the
court.

transmission fluid on the floor of the carport after he returned home from his job on November 10, 2005. He stated that the Blazer had not leaked prior to the repossession, and that they had not had any problems with it prior to that date. The Plaintiffs' testimony that they did not know about the leaks until November 10, 2005, is buttressed by Mr. Hunter's testimony that when he spoke to Mr. Hartleben from the road during the late afternoon hours of November 9, 2005, Mr. Hartleben did not mention any damage to the transfer case or that the vehicle was leaking, although he specifically mentioned the driveway, the chain, and the medication.

Conversely, the Defendant argued that the Plaintiffs' vehicle was damaged prior to the repossession, and in support thereof offered the testimony of Mr. Hood, who testified that he saw transmission fluid or oil under the Blazer when he repossessed it on November 9, 2005, while he was disconnecting the linkage to disable it in order to keep the Plaintiffs from moving it while he retrieved his tow truck. Mr. Hood also testified that with the method that Chevrolet produces Blazers, it was extremely difficult for someone to damage a transfer case. The Defendant did not challenge the $575.00 estimate amount for repairs offered by Mrs. Hartleben during her testimony.

Based upon the record, the court finds the Plaintiffs' testimony to be persuasive and holds that the Blazer was damaged during the repossession. Both Plaintiffs testified that the Blazer was in good condition and without leaks prior to the repossession. Their testimony, in conjunction with Mr. Hunter's testimony, supports their claim that they were unaware that the Blazer was leaking until November 10, 2005, and thus, they did not report this damage to the sheriff's deputy making the police report, nor did Mr. Hartleben mention it to Mr. Hunter on November 9, 2005, while he was still on the road. Also compelling is the fact that Mr. Hood admitted to disconnecting the linkage

during the repossession so that the Blazer could not be driven, and it was only after that action that

the Plaintiffs noticed fluid leaking.  The court additionally notes that Mr. Hood's entire testimony

was delivered in a cavalier manner, during which he acknowledged that he was not alone during his

repossession of the Plaintiffs' vehicle but was accompanied by an individual who did not work for

AAA, that he removed the chain from the Plaintiffs' gate and "tossed [it] into the bushes," and that

when he returned the Blazer after being instructed to do so, he purposely left it at the end of the

Plaintiffs' long driveway, stating that the tires of his tow truck never left the main highway.

Furthermore, other testimony by Mr. Hood directly contradicts Mrs. Hartleben's, such as his

contention that there is a trailer park in close proximity to the Plaintiffs' home, in comparison to hers

that there is no trailer park near her home, and his testimony concerning the property inside the

Blazer at the time of the repossession, including more than $20.00 in cash and golf clubs, compared

to hers that there was possibly $1.00 in change and no golf clubs in the vehicle. Simply stated, the

court does not find Mr. Hood's testimony to be credible.

Additionally, the Plaintiffs are entitled to attorneys' fees in the prosecution of this lawsuit,

as it is the Defendant's responsibility to restore them to their pre-repossession position with respect

to the condition of their Blazer, their driveway, and their gate.

> [A]ttorneys' fees may be awarded where there is a "nonwillful," or inadvertent,
> violation of the automatic stay.  The rationale for such an award has been stated as
> follows:
>
> > In light of our analysis of the policies behind § 362(h) [now
> > § 362(k)(1)], we believe that counsel for a debtor who is jeopardized
> > in any significant manner by a stay violation and reasonably resorts
> > to court to remedy the violation, should recover at least some measure
> > of damages.  Thus, the "injury" requirement should be very broadly
> > construed.  However, in saying this, we cannot forget the policy of

> discouraging satellite fee litigation such as is before us.  Litigation
> pursued . . . simply to ascertain parties' rights as to a creditor's
> actions which, while possibly important as a matter of policy . . .
> should not be awarded with attorneys' fees.
>
> Although the courts awarding attorneys' fees often fail to state with specificity the
> statutory basis of such an award, the authority to make such an award absent a
> demonstration of willfulness appears to be found in § 105(a)[.]

*In re Bennett*, 135 B.R. 72, 77-78 (Bankr. S.D. Ohio 1992) (quoting *McLaughlin v. Fireman's Trust*

*Mortgage Corp. (In re McLaughlin)*, 96 B.R. 554, 561-62 (Bankr. E.D. Pa. 1989)) (other citations

omitted).

The Plaintiffs testified that they made requests of the Defendant for payment of the damages

incurred as a result of the repossession prior to filing this adversary proceeding, but the Defendant

never offered to repair any of the damages.  Since the Plaintiffs sustained actual damages during the

repossession, the Defendant was under a duty to make amends in a timely manner.  As the Plaintiffs

were forced to pursue this adversary proceeding, which was not filed until December 28, 2005, or

seven weeks after the repossession, to be returned to their pre-repossession status, the court finds that

they are entitled to their attorneys' fees.  Trial Exhibit 6, which was not challenged by the Defendant,

evidences that the Plaintiffs incurred attorneys' fees of $1,160.00 between December 28, 2005, and

June 28, 2006, for the prosecution of this adversary proceeding.

**IV**

In summary, the Defendant violated the automatic stay when it repossessed the Plaintiffs'

Blazer through its agent, AAA, on November 9, 2005.  Although the Defendant took immediate

steps to return the vehicle to the Plaintiffs after being made aware of the bankruptcy, and thus, cannot

be found to have willfully violated the stay, it nevertheless damaged the Blazer, the Plaintiffs'

driveway, and the lock and chain on the Plaintiffs' fence.  Based upon the evidence presented and

the entire record before it, the court finds the Plaintiffs are entitled a judgment against the Defendant

in the aggregate amount of $2,678.22, representing $1,160.00 in attorneys' fees, $575.00 to repair

the damaged transfer case on the Blazer, $25.00 to repair the damaged interior console of the Blazer,

$740.22 to repair the ruts in the driveway, and $178.00 for the prescription medication that was

missing from the Blazer post-repossession.

        A judgment consistent with this Memorandum will be entered.


FILED:  July 13, 2006

                                        BY THE COURT

                                        /s/  RICHARD STAIR, JR.

                                        RICHARD STAIR, JR.
                                        UNITED STATES BANKRUPTCY JUDGE